IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 03–cv–165–EWN–MJW

RICHARD JACKSON,

      Plaintiff,

v.

THE BOARD OF TRUSTEES OF METROPOLITAN STATE COLLEGE,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is an employment discrimination case.  Plaintiff Richard Jackson alleges that

Defendant Board of Trustees of Metropolitan State College discriminated against him because of

his race, created a hostile work environment, and retaliated against him for engaging in protected

opposition.  This matter is before the court on Defendant's "Motion for Summary Judgment,"

filed March 19, 2004.  Jurisdiction is based upon 28 U.S.C.A. § 1331 (2004).  At a hearing held

January 7, 2005, the court denied the motion and indicated that a written disposition would

follow.  The matter thereafter fell through the cracks, and this Order and Memorandum of

Decision will correct that omission.

### FACTS

*1.*     *Factual Background*

      Plaintiff is an African-American male who has taught in the criminal justice and

criminology ("CJC") department in the school of professional studies at Metropolitan State College of Denver ("MSCD") since 1981. (Compl. ¶ 2 [filed Jan. 27, 2003] [hereinafter "Compl."]; Def.'s Br. in Supp. of Mot. for Summ. J., Statement of Undisputed Facts ¶¶ 1–2, 6 [filed Mar. 19, 2004] [hereinafter "Def.'s Br."]; *admitted at* Pl.'s Resp. to Def.'s Mot. for Summ. J., Resp. to Undisputed Facts ¶¶ 1–2, 6 [filed May 3, 2004] [hereinafter "Pl.'s Resp."].) Plaintiff is the only African-American male in the CJC department. (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 35; *admitted at* Def.'s Reply in Supp. of Mot. for Summ. J., Resp. to Additional Disputed Facts ¶ 35 [filed June 22, 2004] [hereinafter "Def.'s Reply"].) In 1985, MSCD gave Plaintiff tenure. (Def.'s Br., Statement of Undisputed Facts ¶ 7; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 7.) Plaintiff asserts in this action that Defendant discriminated against him based upon his race, created a hostile work environment, and retaliated against him for engaging in protected opposition. (Compl.)

>    a.    ***The 1990 Student Letter and the 1992 Transformative Management Report***

In February 1990, Arlene Vigil, the dean of the school of professional studies at the time, received and forward to Joseph Sandoval, the chair of the CJC department, a letter from one of Plaintiff's former students. (Def.'s Br., Statement of Undisputed Facts ¶ 23; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 23.) Sandoval, who was a full professor for the CJC department, was the chair of the department from 1982 to 1994, and again from 1997 to present. (*Id.*, Statement of Undisputed Facts ¶¶ 3–4; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 3–4.) The letter from one of Plaintiff's former students criticized Plaintiff's constitutional law class, which led Sandoval to review the file on Plaintiff's constitutional law class. (*Id.*, Statement of Undisputed Facts ¶¶ 24–26; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 24–26.)

Based on what he discovered after reviewing the file, on March 2, 1990, Sandoval wrote a memo to Plaintiff in which he (1) asked Plaintiff to maintain course outlines in more detail than he had in the past, (2) stressed the importance of course content being related to the subject taught, (3) reminded Plaintiff to submit course outlines and exams to the course file, and (4) reminded Plaintiff that being friendly with students did not equate to providing students with a quality education in the classroom. (*Id.*, Statement of Undisputed Facts ¶ 27; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 27.)

Based in part on the outcome of his investigation into the merits of the letter, Sandoval eventually decided that Plaintiff should not teach constitutional law. (*Id.*, Statement of Undisputed Facts ¶ 28; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 28.) Sandoval believes, and Plaintiff disputes, that his 1990 criticism of Plaintiff and his decision that Plaintiff should not teach constitutional law were the catalysts for the many difficulties between the two of them. (*Id.*, Statement of Undisputed Facts ¶ 29; *denied at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 29.)

Around the same time, MSCD hired an outside consultant to investigate and review the personal conflicts within the CJC department. (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 73; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 73.) This outside consultant, Transformative Management, Inc., issued its report on the problems within the CJC department on May 21, 1992. (*Id.*, Statement of Additional Disputed Facts ¶ 74; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 74.) This report noted that staff diversity "attribute[s] [sic] to stressful interpersonal relationships within the department," and it states that ninety percent of the students taking courses in the department were aware of the conflicts among

the faculty members.  (*Id.*, Statement of Additional Disputed Facts ¶ 75; *admitted at* Def.'s Reply,

Resp. to Additional Disputed Facts ¶ 75.)  Plaintiff asserts, and Defendant disputes, that this

report's conclusions are as relevant to the department today as they were in 1992.  (*Id.*, Statement

of Additional Disputed Facts ¶ 78; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶

78.)  During his time at MSCD, however, Plaintiff has never been the target of verbal racial slurs

directed at him.  (Def.'s Br., Statement of Undisputed Facts ¶ 177; *admitted at* Pl.'s Resp., Resp.

to Undisputed Facts ¶ 177.)

>    **b.**    ***MSCD's Policies Regarding Evaluations and Post Tenure Reviews***

A significant portion of the facts relevant to Defendant's motion deal with MSCD's

performance evaluations and its post tenure review of Plaintiff.  In this section I review MSCD's

policies regarding evaluations and post tenure reviews.  In the following sections, I address how

these policies impacted Plaintiff.

At MSCD, each February, tenured and tenure-track faculty submit a self-evaluation so

that MSCD can determine the quality of their performance during the previous year.  (*Id.*,

Statement of Undisputed Facts ¶ 11; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 11.)

Faculty members are expected to provide information that demonstrates their accomplishments

during the evaluation period.  (*Id.*, Statement of Undisputed Facts ¶ 12; *admitted at* Pl.'s Resp.,

Resp. to Undisputed Facts ¶ 12.)  MSCD requires that these self evaluations include information

and supporting documentation regarding the faculty member's accomplishments in the areas of

teaching, professional development, and service.  (*Id.*, Statement of Undisputed Facts ¶¶ 12–14;

*admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 12–14.)

The faculty member's supervisor judges the faculty member based upon a comparison of

the evidence in the faculty member's self evaluation with the departmental guidelines for the specific discipline taught.  (*Id.*, Statement of Undisputed Facts ¶¶ 16–18; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 16–18.)  A supervisor, generally the department chair, assesses a numerical grade for each faculty member's performance and based upon this numerical scale the faculty member is rated as excellent, very good, good, satisfactory, or unsatisfactory.  (*Id.*, Statement of Undisputed Facts ¶ 19; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 19.) When the evaluation is complete, the supervisor and the faculty member meet to discuss the evaluation, and the faculty member signs the evaluation if he or she agrees with the evaluation. (*Id.*, Statement of Undisputed Facts ¶¶ 21–22; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 21–22.)  If the faculty member disagrees with the supervisor's evaluation, he or she must provide a written statement justifying a higher rating.  (*Id.*, Statement of Undisputed Facts ¶¶ 35–36; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 35–36.)

The parties dispute whether these evaluations have been the subject of grade inflation. (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 8; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 8.)  According to Plaintiff, any evaluation less than excellent is equivalent to a failing evaluation.  (*Id.*)  Plaintiff states, and Defendant dispute, that within the CJC department, any professor who scores less than excellent is essentially ineligible for promotion.  (*Id.*, Statement of Additional Disputed Facts ¶ 16; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 16.)  The parties agree that a faculty member's rate of annual pay increases is directly tied to his or her annual evaluation.  (Def.'s Br., Statement of Undisputed Facts ¶¶ 19–20; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 19–20; Pl.'s Resp., Statement of Additional Disputed Facts ¶ 19; *admitted at* Def.'s Reply, Resp. to Additional

Disputed Facts ¶ 19.)  For example, in 2001 and 2002, a faculty member who MSCD evaluated as satisfactory was eligible for a pay raise of 0.065 percent to 1.287 percent of his or her current annual salary, while a faculty member MSCD evaluated as excellent was eligible for a 3.90 percent to 7.780 percent increase.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 20; *admitted in pertinent part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 20.)

Beyond these yearly performance evaluations, MSCD conducts a comprehensive evaluation of the performance of tenured faculty on a five-year cycle, which it refers to as a post tenure review.  (Def.'s Br., Statement of Undisputed Facts ¶ 56; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 56.)  Tenured professors draft a set of goals in the areas of teaching, professional development, and service that they write in the first year of the five year cycle.  (*Id.*, Statement of Undisputed Facts ¶ 57; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 57.)  Then, at the end of the five year cycle, MSCD conducts its post tenure review of the faculty member and requires the tenured professor to submit supporting documentation and a dossier.  (*Id.*, Statement of Undisputed Facts ¶¶ 65–67; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 65–67.)  At the post tenure review, MSCD rates the tenured professor as either satisfactory, or unsatisfactory.  (*Id.*, Statement of Undisputed Facts ¶ 58; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 58.)  The ultimate decision as to whether the tenured professor is satisfactory or unsatisfactory is that of Cheryl Norton, the provost and vice president of academic affairs.  (*Id.*, Statement of Undisputed Facts ¶¶ 68–69; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 68–69.)

### c.    *Plaintiff's Evaluations and Post Tenure Review Prior to 2002*

Prior to addressing Plaintiff's evaluations during specific years, I address a few general

matters regarding Plaintiff's evaluations.  As department chair, it was Sandoval's job to evaluate Plaintiff's performance.  (*Id.*, Statement of Undisputed Facts ¶ 10; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 10.)  Since 1990, Plaintiff has disagreed with every one of Sandoval's evaluations of him.  (*Id.*, Statement of Undisputed Facts ¶ 30; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 30.)  Plaintiff generally believes that his performance has been superior to his Caucasian colleagues in the CJC department.  (*Id.*, Statement of Undisputed Facts ¶ 33; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 33.)

When Sandoval was not the chair of the CJC department, Walt Copley, the interim chair, evaluated Plaintiff as excellent.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 71–72; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 71–72.)  Plaintiff's student evaluations, moreover, are consistently high.  (*Id.*, Statement of Additional Disputed Facts ¶¶ 63–65; *admitted or admitted in pertinent part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 63–65.)  Indeed, in every course and in every category, Plaintiff's mean student evaluation was higher than the mean for the department, school, and college.  (*Id.*, Statement of Additional Disputed Facts ¶ 66; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 66.)  Plaintiff, furthermore, has received letters from students praising his work and teaching abilities.  (*Id.*, Statement of Additional Disputed Facts ¶ 1; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 1.)

### *1.    Plaintiff's 2000 Evaluation*

In March 2000, in anticipation of Sandoval's upcoming meeting with Plaintiff regarding Plaintiff's annual evaluation for 1999, Sandoval sent Plaintiff a memo asking Plaintiff to bring to the meeting documents supporting Plaintiff's self-evaluation and other evidence of Plaintiff's

accomplishments.  (Def.'s Br., Statement of Undisputed Facts ¶ 38; *admitted at* Pl.'s Resp., Resp.

to Undisputed Facts ¶ 38.)  According to Sandoval, he wanted this documentation in order to

help Plaintiff understand the type of materials to submit with his self-evaluation and to help

Plaintiff be a better advocate for himself.  (*Id.*, Statement of Undisputed Facts ¶ 40; *denied at*

Pl.'s Resp., Resp. to Undisputed Facts ¶ 40.)  Defendant asserts that Sandoval did not give any

other faculty members a list of items to bring to the meeting like the one he gave Plaintiff because

the other faculty members gave him sufficient documentation of their accomplishments.  (*Id.*,

Statement of Undisputed Facts ¶ 41; *denied at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 41.)

Plaintiff disputes this assertion, stating that a Hispanic professor in the same department received

a similar document request from Sandoval, and that Sandoval did not request such documentation

from the Caucasian faculty even though they had not submitted any more material than Plaintiff.

(Pl.'s Resp., Resp. to Undisputed Facts ¶ 41.)

    In response to Sandoval's request, on April 4, 2000, Plaintiff filed a grievance complaining

that Sandoval did not require Caucasian male faculty members to provide such documentation at

their meetings.  (Def.'s Br., Statement of Undisputed Facts ¶ 39; *admitted at* Pl.'s Resp., Resp. to

Undisputed Facts ¶ 39.)  Percy Morehouse, MSCD's Executive Director of Equal Opportunity,

and the assistant to the president of MSCD, mediated Plaintiff's grievance.  (*Id.*, Statement of

Undisputed Facts ¶ 42; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 42.)  After

mediation, Sandoval agreed to withdraw his request for documentation, and Plaintiff agreed that

he would follow MSCD's written procedures if he disagreed with Sandoval's evaluation.  (*Id.*,

Statement of Undisputed Facts ¶ 43; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 43.)

    After this mediation, Sandoval evaluated Plaintiff's performance as "very good."  (*Id.*,

Statement of Undisputed Facts ¶¶ 47–48; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 47–48.)  Plaintiff did not file a grievance at the conclusion of Sandoval's 2000 evaluation.  (*Id.*, Statement of Undisputed Facts ¶ 46; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 46.)  On April 20, 2000, Plaintiff disputed his "very good" rating in his annual evaluation, writing that "I honestly feel that I quantitatively meet the requirements to be rated excellent in each evaluation category.  I disagree with your evaluation.  I do not accept a rating of less than excellent in any category of the evaluation."  (*Id.*, Statement of Undisputed Facts ¶ 47; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 47; Def.'s Br., Ex. A–15 [letter from Plaintiff to Sandoval on 4/20/04].)  On April 27, 2000, Sandoval and Plaintiff met to discuss the evaluation.  (*Id.*, Statement of Undisputed Facts ¶ 48; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 48; Def.'s Br., Ex. A–16 [letter from Sandoval to Plaintiff on May 3, 2004.)  On May 3, 2000, Sandoval memorialized the meeting and informed Plaintiff that he would not change Plaintiff's evaluation from "very good" to "excellent."  (*Id.*, Statement of Undisputed Facts ¶ 49; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 49.)

Plaintiff internally appealed Sandoval's evaluation.  Robert Mock, MSCD's dean of the school of professional studies, reviewed Sandoval's decision and the accompanying evidence from both Sandoval and Plaintiff, and concurred with Sandoval's decision.  (*Id.*, Statement of Undisputed Facts ¶ 50; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 50.)  Likewise, Norton found Plaintiff's appeal insufficient to justify a higher rating because it failed to locate or explain what part of the evaluation was erroneous.  (*Id.*, Statement of Undisputed Facts ¶ 51; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 51.)

### 2.   *Plaintiff's 2001 Post Tenure Review*

Plaintiff's second post tenure review arose in 2001. (*Id.*, Statement of Undisputed Facts ¶¶ 60, 73; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 60, 73.) The office of vice president of academic affairs held several training workshops in order to teach the faculty about the post tenure review process and to inform them of the documents and dossier they would have to submit. (*Id.*, Statement of Undisputed Facts ¶¶ 65–67; *admitted or deemed admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 65–67.)[1] Plaintiff never attended any of these workshops. (*Id.*, Statement of Undisputed Facts ¶ 72; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 72.)

Plaintiff asserts, and Defendant denies, that Plaintiff sought guidance from Mock before the dossier was due. (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 79; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 79.) According to Plaintiff, Mock, although aware of the caustic relationship between Plaintiff and Sandoval, advised Plaintiff that he would not help him and instructed him to speak to Sandoval for guidance on completing his dossier. (*Id.*, Statement of Additional Disputed Facts ¶ 80; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 80.) Plaintiff asserts that Mock then stopped returning his telephone calls. (*Id.*, Statement of Additional Disputed Facts ¶ 81; *denied in pertinent part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 81.) According to Plaintiff, he then contacted Morehouse for help in

---

[1]Plaintiff neither admits nor denies Defendant's paragraphs sixty-six and sixty-seven. Plaintiff takes a similar approach elsewhere in his response. (*See* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 67–68, 86–87, 90, 97, 138.) My procedural rules require that the nonmoving party shall either "admit or deny the asserted material facts set forth by the movant[, and a]ny denial shall be accompanied by a brief factual explanation of the reason(s) for the denial and a specific reference to material in the record supporting the denial." (Practice Standards — Civil, Special Instructions Concerning Motions for Summary Judgment ¶ 4.) Since Plaintiff neither admits nor denies these facts, and more importantly, does not cite to the record to support any possible denial, I deem these facts admitted.

completing the dossier, but Morehouse also instructed him to speak to Sandoval. (*Id.*, Statement of Additional Disputed Facts ¶ 81; *admitted in pertinent part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 81.)

Plaintiff's dossier was due on February 11, 2001. (Def.'s Br., Statement of Undisputed Facts ¶ 73; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 73.) Plaintiff did not submit his dossier by this date. (*Id.*, Statement of Undisputed Facts ¶ 74; *denied at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 74; *admitted in pertinent part at* Def.'s Reply, Reply to Undisputed Facts ¶ 74.) Plaintiff asserts that his dossier was late because Mock and Morehouse declined to assist him with his preparation of the dossier. (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 83; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 83.) On March 15, 2001, Mock wrote to Plaintiff to inform him that his dossier was late in violation of his employment contract. (Def.'s Br., Statement of Undisputed Facts ¶ 75; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 75.)

On March 28, 2001, Sandoval rated Plaintiff's performance as unsatisfactory for the year 2000 because Plaintiff failed to submit his dossier and other evaluation materials. (*Id.*, Statement of Undisputed Facts ¶ 95; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 95.) MSCD's written procedures permit such a rating when a faculty member fails to timely submit his or her evaluation materials, and MSCD had rated other faculty members as unsatisfactory in the past for doing so. (*Id.*, Statement of Undisputed Facts ¶¶ 96–97; *admitted in pertinent part, deemed admitted in part at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 96–97.) Plaintiff neither appealed this unsatisfactory rating nor filed a grievance alleging unlawful discrimination with regards to this rating. (*Id.*, Statement of Undisputed Facts ¶ 112; *admitted in pertinent part at* Pl.'s Resp., Resp.

to Undisputed Facts ¶ 112.)

On April 13, 2001, Mock wrote to MSCD's president, Sheila Kaplan, stating that

> I regret to inform you that Professor Jackson has failed to submit
> the documents required to conduct his annual review and post
> tenure review.  Both Dr. Sandoval and I have invited him to explain
> the absence of these documents and have received no response.
> The behavior is unprecedented in this department and this school.
> At this point, I feel the department chair and I have given professor
> Jackson sufficient time and notice to address the issue if we are
> mistaken.  I feel obliged to report these apparent violations of
> [MSCD's] Handbook for your review to determine whether
> disciplinary action is appropriate.

(*Id.*, Statement of Undisputed Facts ¶ 98; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶

98.)  On the same day, Kaplan wrote to Plaintiff to remind him that the provisions of MSCD's

Handbook that require him to submit the materials are incorporated into his employment contract,

and his failure to fulfill a provision of the contract could be grounds for termination.  (*Id.*,

Statement of Undisputed Facts ¶ 99; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 99.)

At Kaplan's request, David Conde, the associate vice president for academic affairs,

conducted an investigation into Plaintiff's failure to submit his annual self evaluation and post

tenure review documents.  (*Id.*, Statement of Undisputed Facts ¶ 104; *admitted at* Pl.'s Resp.,

Resp. to Undisputed Facts ¶ 104.)  On April 19, 2001, Conde met with Plaintiff and told him that

the post tenure review preparation materials were simple and readily available to Plaintiff, and he

loaned Plaintiff a copy.  (*Id.*, Statement of Undisputed Facts ¶ 105; *admitted at* Pl.'s Resp., Resp.

to Undisputed Facts ¶ 105; Pl.'s Resp., Statement of Additional Disputed Facts ¶ 86; *admitted in*

*pertinent part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 86.)  On the same day,

Plaintiff met with Morehouse and admitted that his post tenure review dossier was late.  (*Id.*,

Statement of Undisputed Facts ¶¶ 100–01; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 100–01.)  Plaintiff then began to prepare his dossier.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 84; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 84.)  On April 23 or April 24, 2001, Plaintiff delivered his dossier to the office of academic affairs.  (Def.'s Br., Statement of Undisputed Facts ¶ 106; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 106.)  According to Plaintiff, and denied by Defendant, Conde contacted Plaintiff and advised him that the dossier was satisfactory.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 89; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 89.)

On May 3, 2001, Conde issued a report to Kaplan on his investigation.  (Def.'s Br., Ex. A–30 [Conde's Memo on 5/3/01].)  Four days later, on May 7, 2001, President Kaplan wrote to Plaintiff in order to provide him with notice of potential disciplinary action and to schedule a meeting with Plaintiff to discuss the findings in Conde's report.  (*Id.*, Statement of Undisputed Facts ¶ 107; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 107.)  Kaplan and Plaintiff met on June 6, 2001.  (*Id.*, Statement of Undisputed Facts ¶ 108; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 108; Pl.'s Resp., Statement of Additional Disputed Facts ¶ 91; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 91.)  At this meeting, Kaplan made it clear to Plaintiff that MSCD took its written policies very seriously.  (*Id.*, Statement of Undisputed Facts ¶ 108; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 108.)  In addition to discussing Plaintiff's dossier, Plaintiff complained to Kaplan of ongoing racism in the CJC department, and discussed the Transformative Management report.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 92; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 92.)  Kaplan told Plaintiff that if he believed that Sandoval had been discriminating against him based on his race,

Plaintiff should follow the proper MSCD procedures in reporting it.  (Def.'s Br., Statement of Undisputed Facts ¶ 109; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 109.)

Kaplan thereafter wrote a letter to Plaintiff on June 13, 2001, advising him of MSCD's disciplinary action against him for violating MSCD's handbook by failing to submit an annual self-evaluation, and his post tenure review dossier.  (*Id.*, Statement of Undisputed Facts ¶ 110; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 110.)  Kaplan did not accept Plaintiff's late dossier, and MSCD thereafter moved Plaintiff's post tenure review year to 2002.  (*Id.*, Statement of Undisputed Facts ¶ 111; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 111; Pl.'s Resp., Statement of Additional Disputed Facts ¶ 93; *admitted in pertinent part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 93.)  According to Plaintiff, and denied by Defendant, MSCD's refusal to accept his 2001 dossier made him ineligible for a merit pay increase.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 94; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 94.)  Kaplan also imposed a fine of two weeks salary on Plaintiff for his failure to timely submit his dossier.  (*Id.*, Statement of Additional Disputed Facts ¶ 95; *admitted in pertinent part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 95.)[2]  After experiencing these problems with his post tenure review dossier, Plaintiff began to express his intent to file a formal grievance with the Equal Employment Opportunity Commission ("EEOC") and to file a federal civil rights lawsuit against various members of the department including Sandoval.  (*Id.*, Statement of Additional Disputed Facts ¶ 97; *admitted at* Def.'s Reply, Resp. to

---

[2]Plaintiff asserts that Kaplan could not do so under MSCD's handbook procedures, (Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 95–96), but does not support this assertion with a specific reference to the record in violation of my procedural rules.  (*See* Practice Standards — Civil, Special Instructions Concerning Motions for Summary Judgment ¶ 4.)

Additional Disputed Facts ¶ 97.)

>    **d.      *Sandoval's Removal of Plaintiff as a Professor of the Ethics Class for 2002***

In order to graduate from MSCD, each student must take at least one "capstone course," a course that is supposed to encapsulate all of the student's learning in the previous four years. (Def.'s Br., Statement of Undisputed Facts ¶¶ 114, 116; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 114, 116.)  A course entitled "Ethics for the Criminal Justice Professional" ("ethics") was such a course, and Plaintiff had repeatedly taught this class in the past.  (*Id.*, Statement of Undisputed Facts ¶¶ 113, 115, 128; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 113, 115, 128.)  For spring 2002 semester, Sandoval did not assign Plaintiff to teach the ethics class.  (*Id.*, Statement of Undisputed Facts ¶ 113; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 113.)  The parties do not set forth when Sandoval made this decision, or when Plaintiff discovered this decision.  The record reveals, however, that Sandoval made the decision in June of 2001, and Plaintiff was aware of this decision no later than October 6, 2001.  (*Id.*, Ex. A–36 [letter from Plaintiff to Sandoval on 10/6/01]; Pl.'s Resp., Ex. 3 at 190 [Plaintiff's Dep.].) Sandoval's failure to permit Plaintiff to teach the ethics class did not affect Plaintiff's pay.  (Def.'s Br., Statement of Undisputed Facts ¶ 132; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 132.)  Plaintiff, however, asserts that by not teaching a capstone course, a professor's academic stature is negatively affected.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 114–15; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 114–15.)[3]

---

[3]This is one of several instances where Defendant denies Plaintiff's assertion on the grounds that it is argumentative, conclusory, and not based upon personal knowledge.  (Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 114–15.)  Plaintiff's assertion is premised upon his affidavit and the affidavit of one of his colleagues in the CJC department, Angelina DeLaTorre.  It is well within the knowledge of Plaintiff and DeLaTorre's whether and how a professor's

Sandoval asserts that he did not assign Plaintiff to teach the class because of (1) disagreements between them regarding whether students had to attain a senior status to enroll in the class, (2) disagreements between them regarding an assessment test of the students, (3) Plaintiff's reliance on "real world" teaching, (4) Plaintiff's polemic teaching style, (5) Plaintiff's alleged failure to submit course outlines, (6) Plaintiff's discussion of duplicative material in the class, (7) Plaintiff's discussion of other MSCD faculty in the ethics class, (8) Plaintiff's availability to students, (9) Plaintiff's failure to participate in curriculum development, (10) Plaintiff's failure to use the required three texts, and (11) scheduling difficulties.  (Def.'s Br., Statement of Undisputed Facts ¶¶ 118–31; *admitted in part, denied in part at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 118–31.)  The parties dispute whether Sandoval's assessments regarding these issues were factually correct, proper, and premised upon Sandoval's first hand knowledge.  (*Id.*) Plaintiff maintains that (1) Sandoval had no idea about what Plaintiff was teaching in the ethics class, (2) Plaintiff had properly submitted course outlines, (3) Plaintiff was exceedingly available to students, (4) Plaintiff participated in curriculum development, and (5) Plaintiff's teaching style was Socratic, not polemic.  (Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 118–31; Pl.'s Resp., Statement of Additional Disputed Facts ¶ 116; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 116.)  Plaintiff, furthermore, notes that none of the professors who have taught the ethics class have used the required three textbooks.  (*Id.*, Statement of Additional Disputed Facts ¶¶ 119–27; *admitted in part, denied in part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 119–27.)  Indeed, Defendant's opening brief and reply brief conflict regarding whether Sandoval expected Plaintiff to use one textbook or three textbooks for the ethics class.  (*Compare*

---

academic stature is affected by the classes taught by the professor.

Def.'s Br., Statement of Undisputed Facts ¶ 127; *with* Def.'s Reply, Resp. to Additional Disputed

Facts ¶ 119.)  Plaintiff, furthermore, notes that student evaluations from his ethics classes were

consistently strong.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 65; *admitted in*

*pertinent part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 65.)

On October 6, 2001, Plaintiff wrote to Sandoval complaining that Sandoval was

discriminating against him based upon his race by not assigning him to teach the ethics class.

(Def.'s Br., Ex. A–36 [letter from Plaintiff to Sandoval on 10/6/01].)  Sandoval forwarded this

letter to Kaplan, who in turn forwarded the letter to Morehouse.  (*Id.*, Statement of Undisputed

Facts ¶ 133; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 133.)  Morehouse sent an

electronic mail message to Plaintiff on October 16, 2001, explaining that Plaintiff could either file

a formal grievance or attempt to resolve the issue informally.  (*Id.*)  Plaintiff did not file an actual

grievance with MSCD until April 2002, and did not ask the equal opportunity office to assist him

on issues related to his schedule.  (*Id.*, Statement of Undisputed Facts ¶ 134; *admitted in*

*pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 134.)

  **e.**    ***Plaintiff's Further Complaints, and the Issues Regarding His Teaching***
      ***Schedule***

On November 1, 2001, Plaintiff's attorney wrote a letter to Kaplan regarding Plaintiff's

complaints of racial discrimination and bias, and advised her that Plaintiff might file an EEOC

complaint.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 108; *admitted at* Def.'s Reply,

Resp. to Additional Disputed Facts ¶ 108.)  On November 13, 2001, Plaintiff wrote to J. Michael

Faragher, MSCD's dean of the school of professional studies,[4] complaining that Sandoval was

---

   [4]The parties do not explain whether MSCD has multiple deans for this school, or if
Faragher replaced Mock.

discriminating against him based upon his race by, *inter alia*, not permitting him to teach the

ethics class, giving him an inappropriate teaching schedule consisting of teaching four days a

week, and giving him an out of date computer equipment. (Def.'s Br., Statement of Undisputed

Facts ¶ 135; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 135; Def.'s

Br., Ex. A–38 [letter from Plaintiff to Faragher on 11/13/01].) Faragher asked interim associate

dean of the school of professional studies, Sandra Haynes, to monitor the meetings between

Sandoval and Plaintiff. (*Id.*, Statement of Undisputed Facts ¶¶ 135–36; *admitted in pertinent part

at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 135–36.) Haynes did so, and observed that

Sandoval's demeanor was professional, and he acted in a normal and professional manner. (*Id.*,

Statement of Undisputed Facts ¶¶ 137–40; *admitted in pertinent part at* Pl.'s Resp., Resp. to

Undisputed Facts ¶¶ 137–40.)

The following semester, Sandoval changed Plaintiff's schedule so that he was only

teaching two days a week during the fall 2002 semester, and three days a week during the spring

2003 semester. (*Id.*, Statement of Undisputed Facts ¶¶ 142–43; *admitted at* Pl.'s Resp., Resp. to

Undisputed Facts ¶¶ 142–43.) For the fall 2002 semester, Sandoval scheduled Plaintiff to teach

four back-to-back classes for six and a half hours straight, two days per week. (Pl.'s Resp.,

Statement of Additional Disputed Facts ¶ 128; *admitted at* Def.'s Reply, Resp. to Additional

Disputed Facts ¶ 128.) Plaintiff is diabetic and cannot teach for six and a half hours without

eating. (*Id.*, Statement of Additional Disputed Facts ¶ 129; *admitted at* Def.'s Reply, Resp. to

Additional Disputed Facts ¶ 129.) Neither party sets forth when Sandoval made this decision, or

informed Plaintiff of this decision, but the record demonstrates that Plaintiff was aware of this

decision prior to March 5, 2002. (Def.'s Br., Ex. 47 at 2 [EEOC Complaint].) Normally,

department heads get input from the faculty regarding their teaching schedules.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 112; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 112.)  Plaintiff had no input with respect to those scheduling decisions, and did not learn about them until reviewing the MSCD course catalogue.  (*Id.*, Statement of Additional Disputed Facts ¶ 111; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 111.)

>    f.    **Plaintiff's 2002 Post Tenure Review and Annual Performance Review**

Plaintiff's submitted his post tenure review documents and dossier in February 2002. (Def.'s Br., Statement of Undisputed Facts ¶¶ 156, 160; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 156, 160.)  The first step in MSCD's review of Plaintiff's dossier included a departmental review committee organized to review Plaintiff's dossier.  (*Id.*, Ex. A–44 [Sandoval's Memo to Post Tenure Review Committee on 3/11/02].)  This review committee consisted of Marcia Canavan, Paul Katsampes, and DeLaTorre.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 98; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 98.)  Canavan chaired the committee.  (*Id.*, Statement of Additional Disputed Facts ¶ 99; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 99.)  According to Plaintiff, and disputed by Defendant, the CJC department had a verbal policy that the review committee should hold a meeting in order to review a faculty member's dossier.  (*Id.*, Statement of Additional Disputed Facts ¶ 101; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 101.)  The committee, however, never met regarding Plaintiff's dossier, but rather discussed the issue and voted via electronic mail.  (*Id.*, Statement of Additional Disputed Facts ¶ 102; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 102.)  DeLaTorre's computer was not functioning at the time the committee was reviewing Plaintiff's dossier, so she did not vote on whether to accept

Plaintiff's dossier.  (*Id.*, Statement of Additional Disputed Facts ¶¶ 100, 104; *admitted in pertinent part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 100, 104.)  The parties agree that Katsampes knew DeLaTorre's computer was not working, but dispute whether Canavan knew that DeLaTorre's computer was not working.  (*Id.*, Statement of Additional Disputed Facts ¶ 100; *admitted in part, denied in part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 100.)  DeLaTorre's lack of participation in the process and the vote was important because the committee had a tie vote.  DeLaTorre was a staunch supporter of Plaintiff and his work and consistently evaluated his work as excellent in peer evaluations.  (*Id.*, Statement of Additional Disputed Facts ¶¶ 105–06; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 105–06.)  In the actual vote, Katsampes voted to find Plaintiff's dossier "satisfactory," while Canavan voted to find Plaintiff's dossier "unsatisfactory."  (*Id.*, Statement of Additional Disputed Facts ¶ 107; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 107.)

Following the department review committee vote, on March 11, 2002, Sandoval determined that Plaintiff's dossier was "unsatisfactory."  (Def.'s Br., Statement of Undisputed Facts ¶ 160; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 160; Def.'s Br., Ex. A–44 [Sandoval's Memo to Post Tenure Review Committee on 3/11/02].)  Sandoval, and then Faragher, found that Plaintiff's dossier was incomplete because of missing materials and the fact that Plaintiff had not reached the goals he had set for himself.  (*Id.*, Statement of Undisputed Facts ¶¶ 161–62; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 161–62.)  Norton reviewed this decision.  (*Id.*, Statement of Undisputed Facts ¶¶ 163–75; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 163–75.)  As part of this review, Norton had Morehouse review the dossier and interview Plaintiff.  (*Id.*, Statement of Undisputed Facts ¶¶

164–70; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 164–70.)

Morehouse concluded that Plaintiff had met some, but not all, of his goals.  (*Id.*, Statement of

Undisputed Facts ¶¶ 166–69; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts

¶¶ 166–69.)  On June 5, 2002, Norton informed Plaintiff that she had determined his dossier was

satisfactory.  (*Id.*, Statement of Undisputed Facts ¶ 172; *admitted at* Pl.'s Resp., Resp. to

Undisputed Facts ¶ 172.)  She cautioned Plaintiff, however, that similar deficiencies in his next

post tenure review dossier would result in an unsatisfactory rating.  (*Id.*, Statement of Undisputed

Facts ¶ 174; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 174.)

Beyond the post tenure review issues discussed above, Plaintiff also raises complaints

about Sandoval's rating of him in Plaintiff's 2002 performance review.  Plaintiff submitted his

annual self-evaluation for academic year 2002 in early 2003.  (Pl.'s Resp., Statement of Additional

Disputed Facts ¶ 54; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 54.)  Plaintiff

asserts that his self-evaluation met the specific criteria enumerated by faculty evaluation guidelines

in order to receive a score of excellent in the teaching category.  (*Id.*, Statement of Additional

Disputed Facts ¶¶ 45–53, 55–56, 58; *admitted in part, denied in part at* Def.'s Reply, Resp. to

Additional Disputed Facts ¶¶ 45–53, 55–56, 58.)  Sandoval, however, gave Plaintiff a score of

satisfactory in the teaching category.  (*Id.*, Statement of Additional Disputed Facts ¶ 57; *admitted

in pertinent part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 57.)  Defendant contends

that Plaintiff failed to attach the necessary documentation to his self-evaluation in order to be

rated higher than satisfactory.  (Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 55–56, 58.)

Plaintiff maintains that his 2002 self-evaluation was similar to Katsampes' self evaluation, whom

Sandoval rated as excellent, while Defendant argues that unlike Plaintiff, Katsampes attached the

necessary document to his self-evaluation.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 59–62; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 59–62; Def.'s Reply, Ex. A–49 ¶ 27 [Sandoval Aff.].)

g.    *Plaintiff's Old Computer and Lack of a Window Office*

According to Plaintiff, during his time at MSCD, he often had the worst computer in the department.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 132; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 132.)  Plaintiff maintains, and Defendant disputes, that both Sandoval and Mock knew that his computer would not accept electronic mail messages, yet they would still schedule meetings by electronic mail.  (*Id.*, Statement of Additional Disputed Facts ¶ 133; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 133.)  When Plaintiff requested a new computer, MSCD instead gave him Canavan's old computer.  (*Id.*, Statement of Additional Disputed Facts ¶ 134; *admitted in part, denied in part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 134.)

Plaintiff asserts, and Defendant (surprisingly) denies, that in academia, a window office is an important symbol of respect and is generally a reward for seniority in the department.  (*Id.*, Statement of Additional Disputed Facts ¶ 135; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 135.)  Historically, faculty with the greatest seniority receive window offices within the CJC department.  (*Id.*, Statement of Additional Disputed Facts ¶ 136; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 136.)  MSCD has given Caucasian faculty in the CJC department, with less seniority than Plaintiff, window offices.  (*Id.*, Statement of Additional Disputed Facts ¶ 137; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 137.)  According to Plaintiff, and denied by Defendant, Plaintiff requested a window office at least as

-22-

early as 1998 and was not consulted when window offices became vacant thereafter. (*Id.*, Statement of Additional Disputed Facts ¶ 144; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 144.)  Less senior professors received window offices prior to Plaintiff.  For example, Katsampes received a window office in 1998, and Canavan received a window office in 2000.  (*Id.*, Statement of Additional Disputed Facts ¶¶ 140–41; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 140–41.)  When Canavan resigned in 2003, MSCD gave her window office to two part-time faculty.  (*Id.*, Statement of Additional Disputed Facts ¶ 142; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 142.)  When the MSCD did not renew the two part-time faculties' contracts, MSCD offered Canavan's former window office to Plaintiff.  (*Id.*, Statement of Additional Disputed Facts ¶ 143; *admitted in pertinent part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 143.)

> **h.    *Plaintiff's Compensation***

The final factual issue Plaintiff raises in response to Defendant's motion for summary judgment is the issue of his compensation.  Plaintiff makes less money than any other tenured faculty member in the CJC department even though he is the second most senior faculty member in the CJC department after Sandoval.  (*Id.*, Statement of Additional Disputed Facts ¶¶ 22–23; *admitted in pertinent part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 22–23.) Plaintiff's annual salary is $41,265.  (*Id.*, Statement of Additional Disputed Facts ¶ 36; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 36.)  Prior to his retirement in 2003, Katsampes, a male Caucasian full-time tenured professor in the CJC department, who MSCD hired five years after Plaintiff, earned $55,453 annually.  (*Id.*, Statement of Additional Disputed Facts ¶¶ 37–38; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 37–38.)  Harol

Nees, a male Caucasian full-time tenured professor in the CJC department, who MSCD hired

sixteen years after Plaintiff, earned $44,712 annually.  (*Id.*, Statement of Additional Disputed

Facts ¶¶ 39–40; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 39–40.)  Prior to

her resignation in 2002, Canavan, a female Caucasian full-time tenured faculty professor in the

CJC department, who MSCD hired eight years after Plaintiff, earned $48,119 annually.  (*Id.*,

Statement of Additional Disputed Facts ¶¶ 43–44, 98; *admitted at* Def.'s Reply, Resp. to

Additional Disputed Facts ¶¶ 43–44, 98.)  Prior to his retirement, Copley, a Caucasian full-time

tenured professor in the CJC department, whom MSCD hired at the same time as Plaintiff, earned

$54,210 annually.  (*Id.*, Statement of Additional Disputed Facts ¶¶ 41–42; *admitted at* Def.'s

Reply, Resp. to Additional Disputed Facts ¶¶ 41–42.)  Moreover, when MSCD hired Plaintiff and

Copley into the same department in 1981, Plaintiff received an annual salary of $17,960, while

Copley received an annual salary of $21,320.  (*Id.*, Statement of Additional Disputed Facts ¶¶ 24,

26; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 24, 26.)  According to

Plaintiff, and disputed by Defendant, both Copley and Plaintiff had nearly identical qualifications

when they were hired, except for the fact that Plaintiff had already received his doctorate degree

but Copley was only a doctoral candidate at the time.  (*Id.*, Statement of Additional Disputed

Facts ¶ 27; *denied at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 27.)

## 2.   *Procedural History*

Plaintiff filed a charge of discrimination with the EEOC on March 5, 2002.  (Def.'s Br.,

Statement of Undisputed Facts ¶ 181; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 181.)

On October 29, 2002, the EEOC issued its notice of right to sue.  (Compl. ¶ 9.)  Plaintiff filed a

complaint in this court on January 27, 2003 alleging that Defendant, Kaplan, Norton, Sandoval,

Faragher, and Mock, in their individual and official capacities, violated Title VII, 42 U.S.C.A. §

1981, and 42 U.S.C.A. § 1983.  (Compl.)  Plaintiff's Title VII claim consists of three parts,

disparate treatment, retaliation, and hostile work environment.  (*Id.* at ¶¶ 34–41.)[5]  On March 17,

2003, the Defendants filed a motion to dismiss and a motion for a more definite statement.

(Within [sic] Mot. to Dismiss and Mot. for More Definitive Statement [filed Mar. 17, 2003].)  I

held a hearing on this motion on May 27, 2003 at which I orally granted the Defendants' motion

in part and denied it in part.  (Courtroom Mins. [dated May 27, 2003].)  I dismissed all of the

individual Defendants, and all of Plaintiff's claims except for his Title VII claim.  (*Id.*)

On March 19, 2004, Defendant moved for summary judgment.  (Mot. for Summ. J. [filed

Mar. 9, 2004].)  Plaintiff filed his response on May 3, 2004, and Defendant filed its reply on June

22, 2004.  (Pl.'s Resp; Def.'s Reply.)  Then, on June 30, 2004, Defendant filed a document styled

"Supplemental Authority in Support of Motion for Summary Judgment."   (Supplemental

Authority in Supp. of Mot. for Summ. J. [filed June 30, 2004] [hereinafter "Def.'s Supplemental

Authority"].)

## ANALYSIS

### 1.    *Standard of Review*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant

summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and the . . . moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)

---

[5]The parties address, as I do, Plaintiff's Title VII claim as three different claims: disparate
treatment, retaliation, and hostile work environment.

(2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp.*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "'Only disputes over facts that might affect the outcome of the suit under governing law will preclude the entry of summary judgment.'"  *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998) (quoting *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).  The factual record must be viewed in the light most favorable to the nonmoving party.  *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 [10th Cir. 1990]).

**2.      *Exhaustion of Administrative Remedies***

As a preliminary matter, I address the timeliness of Plaintiff's claims.  Plaintiff bears the burden to show that his claims are timely.  *Celestine v. Petroleos de Venezuela SA*, 266 F.3d 343, 351 (5th Cir. 2001).  A plaintiff must file a complaint with the EEOC within 300 days from the date of the unlawful employment practice in order to avoid summary judgment.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002); *Croy v. Cobe Labs., Inc.*, 345 F.3d 1199,

1202 (10th Cir. 2003); *Herrera v. Int'l Bhd. of Elec. Workers Union*, 228 F. Supp. 2d 1233, 1240 (D. Colo. 2002). This means that the court will only consider, with the exceptions outlined below, unlawful employment practices that occurred within 300 days prior to the date of the EEOC complaint. *Id.* The court, moreover, may not consider, with the exceptions outlined below, unlawful employment practices that occurred after a plaintiff filed his EEOC complaint. *Martinez v. Potter*, 347 F.3d 1208, 1210–11 (10th Cir. 2003). Here, Plaintiff filed his EEOC complaint on March 5, 2002. (Def.'s Br., Statement of Undisputed Facts ¶ 181; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 181.) Accordingly, the unlawful employment practices must have occurred between May 9, 2001 and March 5, 2002. (*Id.*)

This rule applies to Plaintiff's disparate treatment and retaliation claims, for "discrete acts of discrimination are not actionable if they fall outside the limitations period, even if they are related to acts which fall within the limitations period." *Croy*, 345 F.3d at 1202. Regarding Plaintiff's hostile work environment claim, however, "'[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'" *Id.* (quoting *Nat'l R.R. Passenger*, 536 U.S. at 117) (alteration in original). Thus, for Plaintiff's disparate treatment and retaliation claims, I only consider unlawful employment practices between May 9, 2001 and March 5, 2002. Regarding Plaintiff's hostile work environment claim, however, since there is at least one act contributing to the claim during the filing period, I consider all of Defendant's unlawful employment practices as alleged by Plaintiff.

Exhaustion of administrative remedies applies not only to the timing of Plaintiff's EEOC complaint, but also to the contents of this complaint. Accordingly, Defendant argues that a new

Tenth Circuit case's rule regarding what must be in an EEOC complaint bars evidence of (1)

Plaintiff's faulty computer, and (2) Plaintiff's windowless office.  (Def.'s Supplemental

Authority.)  In *Annett v. University of Kansas*, the Tenth Circuit held that with regards to

disparate treatment and retaliation claims, each discrete retaliatory (or discriminatory) act must be

set forth in the plaintiff's EEOC complaint.  *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1238

(10th Cir. 2004).  Here, Plaintiff's EEOC complaint addresses Plaintiff's computer, so I will

consider the issue with regards to Plaintiff's disparate treatment and retaliation claims.  (Def.'s

Br., Ex. A–47 at 2 [EEOC complaint].)  Plaintiff's EEOC complaint does not address Plaintiff's

windowless office, so I will not consider this issue with regards to Plaintiff's disparate treatment

and retaliation claims.  (*Id.*, Ex. A–47 [EEOC complaint].)  I consider both issues with regards to

Plaintiff's hostile work environment claim.

### 3.      *Plaintiff's Disparate Treatment Claim*

Defendant argues that it is entitled to summary judgment on Plaintiff's disparate treatment

claim.  (*Id.* at 30–41.)  Specifically, Defendant argues that Plaintiff has not demonstrated that (1)

any adverse employment actions occurred, (2) defendant treated similarly situated employees

differently, and (3) there is sufficient evidence of pretext to survive summary judgment.  (*Id.*)  42

U.S.C.A. § 2000e-2(a)(1) provides that "[i]t shall be an unlawful employment practice for an

employer . . . to discharge any individual . . . because of such individual's race."  42 U.S.C.A. §

2000e-2(a)(1) (2004).  A plaintiff can demonstrate discrimination in a Title VII case by either (1)

presenting direct evidence of a discriminatory motive in her termination, or (2) using the

*McDonnell Douglas* burden-shifting framework.  *Burn v. Bd. of County Comm'rs of Jackson*

*County*, 330 F.3d 1275, 1283 (10th Cir. 2003); *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85

F.3d 1472, 1476–77 (10th Cir. 1996).  Here, both parties agree that Plaintiff must use the *McDonnell Douglas* burden-shifting framework.  (Def.'s Br. at 30; Pl.'s Resp. at 38.)  Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case.  *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1212 (10th Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [1973]).  Once the plaintiff makes a *prima facie* showing, the defendant "must articulate a legitimate, nondiscriminatory reason for the adverse employment action."  *Id.*  Then, at the third stage, the plaintiff must respond by demonstrating that the defendant's "asserted reasons for the adverse action are pretextual."  *Id.*  (citation omitted; internal quotation marks omitted).  I address each stage in turn.

###### a.      *Prima Facie Case*

In order to set forth a *prima facie* case of disparate impact discrimination, Plaintiff must establish "(1) that he is a member of a racial minority, (2) that he suffered an adverse employment action, and (3) that similarly situated employees were treated differently."  *Trujillo v. Univ. of Colorado Health Scis. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).  I can quickly resolve the first and third factors.  Regarding the first factor, Plaintiff has established that he is a member of a racial minority.  (*See, e.g.,* Pl.'s Resp., Statement of Additional Disputed Facts ¶ 35; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 35.)  Regarding the third factor, the facts during the relevant time frame, taken in a light most favorable to Plaintiff, show that MSCD treated similarly situated employees differently in terms of compensation, fines, computer equipment, and scheduling of classes, including Sandoval's removal of Plaintiff from teaching the ethics class.  (Def.'s Br., Statement of Undisputed Facts ¶¶ 108, 110–11, 113, 118–32, 142–43; *admitted in part, denied in part at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 108, 110–11, 113,

118–32, 142–43; Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 22–24, 26–27, 36–44,

65, 91, 93–95, 98, 111–12, 114–16, 119–29, 132–34; *admitted in part, denied in part at* Def.'s

Reply, Resp. to Additional Disputed Facts ¶¶ 22–24, 26–27, 36–44, 65, 91, 93–95, 98, 111–12,

114–16, 119–29, 132–34; Def.'s Br., Ex. A–36 [letter from Plaintiff to Sandoval on 10/6/01];

Pl.'s Resp., Ex. 3 at 190 [Plaintiff's Dep.]; *and compare* Def.'s Br., Statement of Undisputed

Facts ¶ 127; *with* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 119.)

The second factor requires a little more analysis.  An adverse employment action occurs

when there is "'a significant change in employment status, such as hiring, firing, failing to

promote, reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits.'"  *Annett*, 371 F.3d at 1237 (quoting *Burlington Indus., Inc. v.

Ellerth*, 524 U.S. 742, 761 [1998]).  Moreover, "acts that carry 'a significant risk of humiliation,

damage to reputation, and a concomitant harm to future employment prospects'" constitute

adverse employment actions.  *Id.* at 1239 (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980,

986 [10th Cir. 1996]).  Written reprimands also constitute adverse employment actions.  *See

Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1183 (10th Cir. 2002) (holding that

a written reprimand can constitute an adverse employment action); *Roberts v. Roadway Exp.,

Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998) (holding that employer's written warnings to an

employee, which make it more likely that the employee will be terminated for further infractions,

constitutes an adverse employment action).  Since Title VII is a remedial statute, courts should

"employ[] a liberal definition of adverse employment action and [apply] a case-by-case approach."

*Abuan v. Level 3 Communications, Inc.*, 353 F.3d 1158, 1174 (10th Cir. 2003).  "[T]he

challenged action must[, however,] rise above 'a mere inconvenience or an alteration of job

responsibilities.'" *Id.* at 1174 n.5 (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 [10th Cir. 1998]).

Here, the facts taken in a light most favorable to Plaintiff demonstrate, *inter alia*, that (1) Kaplan issued a letter of disciplinary action against Plaintiff, (2) fined Plaintiff, and (3) these actions resulted in Plaintiff's failure to receive a merit pay increase. (Def.'s Br., Statement of Undisputed Facts ¶¶ 108, 110–11; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 108, 110–11; Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 91, 93–95; *admitted in part, denied in part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 91, 93–95.)  All of these actions occurred within the proper time frame. (*Id.*)  Moreover, Sandoval repeatedly gave Plaintiff poor performance reviews which resulted in Plaintiff receiving less pay than his Caucasian counterparts. (*See generally* Def.'s Br., Statement of Undisputed Facts ¶¶ 10, 19–20, 30, 33; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 10, 19–20, 33; Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 19–20; *admitted in pertinent part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 19–20.)[6]  Accordingly, the facts taken in a light most favorable to Plaintiff demonstrate that Plaintiff suffered adverse employment actions.  Plaintiff therefore has shown a *prima facie* case.

### b.     *Legitimate Nondiscriminatory Reason*

Once plaintiff makes a *prima facie* showing, the defendant "must articulate a legitimate,

---

[6]While Sandoval's poor performance reviews are outside the applicable time limitations, Plaintiff's lower salary as a result of these poor performance reviews is within the applicable time limitations, so Plaintiff's lower salary constitutes an adverse employment action. *See Nat'l R.R. Passenger*, 536 U.S. at 111–12 (each paycheck that the employer issues that is discriminatory is a separate wrong actionable under Title VII.) (citing *Bazemore v. Friday*, 478 U.S. 385, 395 [1986] [per curiam]); *see also Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1186 (10th Cir. 2003).

nondiscriminatory reason for the adverse employment action." *Wells*, 325 F.3d at 1212. Both

parties agree, and I concur, that Defendant has articulated legitimate nondiscriminatory reasons

for the adverse employment actions. Defendant contends that Plaintiff's failure to timely submit

the documents Defendant required him to submit in support of his post-tenure review and

performance evaluations resulted in the reprimands and lower salary. (Def.'s Br. at 31; Pl.'s

Resp. at 38; Def.'s Br., Statement of Undisputed Facts ¶¶ 72–74, 95–97, 100–01, 106; *admitted

in part, denied in part at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 72–74, 95–97, 100–01, 106.)

I therefore address the third stage, pretext.

      *c.*    *Pretext*

> If the employer provides a legitimate, non-discriminatory
> justification for the action, the burden shifts back to the employee
> to provide evidence showing that the employer's proffered reason is
> a pretext for discrimination. An employee may demonstrate pretext
> by showing the employer's proffered reason was so inconsistent,
> implausible, incoherent, or contradictory that it is unworthy of
> belief.

*Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004). Moreover, "disturbing procedural

irregularities, including deviations from normal company procedure, provide support for a

plaintiff's assertion of pretext." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n. 11

(10th Cir. 2003) (internal quotation marks omitted). Furthermore, "evidence indicating that an

employer misjudged an employee's performance . . . is, of course, relevant to the question of

whether [the employer's] stated reason [for its actions] is . . . masking prohibited discrimination."

*Minshall v. McGraw Hill Broadcasting, Co., Inc.*, 323 F.3d 1273, 1280 (10th Cir. 2003) (quoting

*Tyler v. Re/Max Mountain States, Inc.*, 232 F.3d 808, 813–14 [10th Cir. 2000]) (alterations in

original).

Here, the facts taken in a light most favorable to Plaintiff show that MSCD's agent's decisions regarding Plaintiff's evaluations and review as well as other disturbing procedural irregularities, demonstrate pretext.  There are issues of disputed material fact as to the appropriateness of Sandoval's evaluations of Plaintiff in his performance reviews.  Plaintiff asserts that he performed better then his Caucasian peers, yet received lower performance reviews. (Def.'s Br., Statement of Undisputed Facts ¶¶ 10, 20, 33; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 10, 20, 33.)  Although "[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance," *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996), there are several other indications of Plaintiff's strong performance.  For example, other professors, and Plaintiff's previous supervisor considered Plaintiff's performance excellent, and student evaluations of Plaintiff's performance were consistently above average.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 1, 63–66, 71–72, 105–106; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 1, 63–66, 71–72, 105–106.)  Moreover, the facts taken in a light most favorable to Plaintiff demonstrate that MSCD's administration improperly referred all issues regarding Plaintiff's completion of his dossier to Sandoval, and then ignored his further requests for assistance.  (*Id.*, Statement of Additional Disputed Facts ¶¶ 79–81; *admitted in part, denied in part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 79–81.)  As discussed above, these actions impacted Plaintiff's pay during the relevant time period.

The facts taken in a light most favorable to Plaintiff also show numerous other inconsistencies and deviations from MSCD's procedures which suggest pretext.  First, and related to the analysis in the previous paragraph, the fact that Plaintiff is the only Africa-American male in

-33-

the department, has the second highest seniority, yet receives the lowest salary, suggests pretext. (*Id.*, Statement of Additional Disputed Facts ¶¶ 22–24, 26–27, 35–44, 98; *admitted in part, denied in part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 22–24, 26–27, 35–44, 98.) Second, Sandoval's rationales for removing Plaintiff from teaching the ethics class are questionable, and with regards to the required classroom textbooks, Defendant's position is internally inconsistent. (Def.'s Br., Statement of Undisputed Facts ¶¶ 113, 118–32; *admitted in part, denied in part at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 113, 118–32; Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 65, 114–16, 119–27; *admitted in part, denied in part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 65, 114–16, 119–27; Def.'s Br., Ex. A–36 [letter from Plaintiff to Sandoval on 10/6/01]; Pl.'s Resp., Ex. 3 at 190 [Plaintiff's Dep.]; *compare* Def.'s Br., Statement of Undisputed Facts ¶ 127; *with* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 119.) Third, Plaintiff's poor computer, in light of his seniority, suggests disparate treatment. (Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 132–34; *admitted in part, denied in part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 132–34.) Fourth, the manner in which the department review committee reviewed Plaintiff's dossier did not follow departmental procedure, which resulted in the department review committee not voting to accept Plaintiff's dossier. (*Id.*, Statement of Additional Disputed Facts ¶¶ 98–102, 104–07; *admitted in part, denied in part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 98–102, 104–107; Def.'s Br., Ex. A–44 [Sandoval's Memo to Post Tenure Review Committee on 3/11/02].) Finally, Sandoval's decision to schedule Plaintiff's classes without input from Plaintiff, against the practice in the CJC department, suggests pretext. (Def.'s Br., Statement of Undisputed Facts ¶¶ 142–43; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 142–43; Pl.'s Resp., Statement of

Additional Disputed Facts ¶¶ 111–12, 128; *admitted at* Def.'s Reply, Resp. to Additional

Disputed Facts ¶¶ 111–12, 128; Def.'s Br., Ex. 47 at 2 [EEOC Complaint].)  In light of the

foregoing, the evidence taken in a light most favorable to Plaintiff demonstrates pretext.

### 4.    *Plaintiff's Retaliation Claim*

Defendant moves for summary judgment on Plaintiff's retaliation claim.  (Def.'s Br. at

41–43.)  "Title VII prohibits an employer from discriminating against an employee in retaliation

for opposing unlawful employment practices."  *Penry v. Fed. Home Loan Bank of Topeka*, 155

F.3d 1257, 1263 (10th Cir. 1998) (citing 42 U.S.C. § 2000e-3[a]).  In such an action, courts

apply the *McDonnell Douglas* burden-shifting framework.  *Cole v. Ruidoso Mun. Schs.*, 43 F.3d

1373, 1381 (10th Cir. 1994).  In order

> [t]o establish a prima facie case of retaliation under Title VII, the
> plaintiff must show that '(1) []he engaged in protected opposition
> to Title VII discrimination . . . (2) []he suffered an adverse
> employment action contemporaneous with or subsequent to such
> opposition; . . . and (3) there is a causal connection between the
> protected activity and the adverse employment action.'

*Penry*, 155 F.3d at 1263–64 (quoting *Cole*, 43 F.3d at 1381).  Informal complaints to superiors or

the use of the employer's internal grievance procedures constitutes protected activity under Title

VII.  *Robbins v. Jefferson County Sch. Dist. R-1*, 186 F.3d 1253, 1258 (10th Cir. 1999).  Here,

Plaintiff engaged in protected opposition during the relevant time frame by (1) complaining to

Kaplan of racism on June 6, 2001, (2) expressing his intent to file a formal grievance with the

EEOC and to file a federal civil rights lawsuit after this meeting and Kaplan's decisions, (3)

complaining to Sandoval that Sandoval was racially discriminating against him by not assigning

him the ethics class, (4) having his attorney send the November 1, 2001 letter to Kaplan regarding

Plaintiff's complaints of racial discrimination, and (5) writing to Faragher on November 13, 2001 to complain that Sandoval was racially discriminating against him.  (Def.'s Br., Statement of Undisputed Facts ¶¶ 108, 135; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 108, 135; Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 91–92, 97, 108; *admitted at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 91–92, 97, 108; Def.'s Br., Ex. A–36 [letter from Plaintiff to Sandoval on 10/6/01]; Def.'s Br., Ex. A–38 [letter from Plaintiff to Faragher on 11/13/01].)  As set forth above, Plaintiff suffered adverse employment actions because of Kaplan's letter of disciplinary action against Plaintiff and fining Plaintiff, which in turn resulted in Plaintiff's failure to receive a merit pay increase.  (Def.'s Br., Statement of Undisputed Facts ¶¶ 108, 110–11; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 108, 110–11; Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 91, 93–95; *admitted in part, denied in part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 91, 93–95.)  These actions immediately followed Plaintiff's June 6, 2001 complaint, so Plaintiff has shown a sufficient causal connection.  *See Stover*, 382 F.3d at 1071 (holding that a Plaintiff may establish a causal connection by showing that the protected opposition is "closely followed by [the] adverse action."); *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320 (10th Cir. 1999) (same).  Moreover, the concerns set forth above regarding pretext also help demonstrate a causal connection for the purposes of surviving summary judgment.

As set forth above, Defendant has articulated legitimate nondiscriminatory reasons for its actions.  Also as set forth above, Plaintiff has sufficiently demonstrated pretext in order to survive summary judgment that Defendant's reasons are unworthy of credence in light of MSCD's inconsistencies and failures to follow its internal policies.  Accordingly, Plaintiff's retaliation claim

survives summary judgment.

### 5.     *Hostile Work Environment*

Defendant moves for summary judgment on Plaintiff's hostile work environment claim.
(Def.'s Br. at 27–29.)  In order to survive summary judgment on a hostile work environment
claim, a "[p]laintiff must show that 'under the totality of the circumstances (1) the harassment was
pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the
harassment was racial or stemmed from racial animus.'"  *Trujillo*, 157 F.3d at 1214 (quoting
*Bolden v. PRC Inc.*, 43 F.3d 545, 551 [10th Cir. 1994]).  In *Trujillo*, the Tenth Circuit explained
that the employee plaintiff "was not subjected to anything that was physically threatening or
humiliating, nor was he subjected to any offensive utterances.  Plaintiff's list of grievances
includes none of the racial comments or ridicule that are hallmarks of hostile work environment
claims."  *Id.* (citation omitted).  Nevertheless, racial comments or ridicule are not required in a
hostile work environment claim.  Regarding hostile work environment claims in the sex
discrimination context, such claims do not require "overtly 'sexual' comments or acts."
*Donaldson v. Am. Banco Corp., Inc.*, 945 F. Supp. 1456, 1461 (D. Colo. 1996) (citing *Hicks v.
Gates Rubber Co.*, 833 F.2d 1406, 1415 [10th Cir. 1987]); *see also O'Shea v. Yellow Tech.
Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999).  Rather, "'any harassment or other unequal
treatment of an employee or group of employees that would not occur but for the sex of the
employee or employees may, if sufficiently patterned or pervasive, comprise an illegal condition of
employment under Title VII.'"  *Hicks*, 833 F.2d at 1415 (quoting *McKinney v. Dole*, 765 F.2d
1129, 1138–39 [D.C. Cir. 1985]).  This rule equally applies to hostile work environment claims
on the basis of race.  *See, e.g., Turner v. Barr*, 811 F. Supp. 1, 2 (D.D.C. 1993) ("the harassment

need not take the form of incidents with clearly racial or religious overtones; 'any harassment or other unequal treatment of an employee' caused by the race or religion of the employee may create a violation of Title VII.") (quoting *McKinney*, 765 F.2d at 1138).

The facts taken in a light most favorable to Plaintiff demonstrate that Defendant's agents harassed him by, *inter alia*, (1) repeatedly evaluating him at a lower level than appropriate, causing him to have a lower salary than his Caucasian counterparts, (2) failing to give him a window office despite his seniority, (3) failing to give him a working computer despite his seniority, (4) removing him from teaching the ethics class for, *inter alia*, violations of the textbook policy that every other professor also violated, (5) scheduling classes that he could not teach because of his medical needs, (6) scheduling classes without consulting Plaintiff contrary to departmental policy, (7) repeatedly referring him to get help from Sandoval on his performance evaluations and post tenure review forms despite his repeated claims that Sandoval felt racial animosity towards him, and (8) failing to follow meeting procedures during the departmental review committee's consideration of the adequacy of his dossier. (Def.'s Br., Statement of Undisputed Facts ¶¶ 10, 19–20, 33, 113, 118–32, 142–43; *admitted in part, denied in part at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 10, 19–20, 33, 113, 118–32, 142–43; Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 1, 19–20, 63–66, 71–72, 79–81, 98–102, 104–07, 111–12, 114–16, 119–29, 132–37, 140–44; *admitted in part, denied in part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 1, 19–20, 63–66, 71–72, 79–81, 98–102, 104–07, 111–12, 114–16, 119–29, 132–37, 140–44; Def.'s Br., Ex. A–36 [letter from Plaintiff to Sandoval on 10/6/01], Ex. A–44 [Sandoval's Memo to Post Tenure Review Committee on 3/11/02], Ex. 47 at 2 [EEOC Complaint]; Pl.'s Resp., Ex. 3 at 190 [Plaintiff's Dep.]; *and compare* Def.'s Br.,

Statement of Undisputed Facts ¶ 127; *with* Def.'s Reply, Resp. to Additional Disputed Facts ¶ 119 [regarding the ethics class and other scheduling issues].)  Unlike *Trujillo*, the facts taken in a light most favorable to Plaintiff, show that the environment in the CJC department of MSCD is not "simply a work environment that exhibits the monitoring and job stress typical of life in the real world." *Trujillo*, 157 F.3d at 1214.  Rather, the facts taken in a light most favorable to Plaintiff show harassment that was both pervasive and severe.

A reasonable jury, moreover, could infer that such harassment stemmed from racial animus in light of the fact that (1) Plaintiff is the only African-American male in the CJC department and suffered the aforementioned consequences despite his seniority, (2) Plaintiff repeatedly complained of racial discrimination to defendant's agents who were harassing him, and (3) an outside group found that racial issues permeated the CJC department, and Plaintiff alleges that nothing has changed since this outside group reached these conclusions.  (Def.'s Br., Statement of Undisputed Facts ¶¶ 108, 135; *admitted in pertinent part at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 108, 135; Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 35, 73–75, 78, 91–92, 97, 108; *admitted in part, denied in part at* Def.'s Reply, Resp. to Additional Disputed Facts ¶¶ 35, 73–75, 78, 91–92, 97, 108; Def.'s Br., Ex. A–36 [letter from Plaintiff to Sandoval on 10/6/01]; Def.'s Br., Ex. A–38 [letter from Plaintiff to Faragher on 11/13/01].)  In light of the foregoing, Plaintiff can survive summary judgment on his hostile work environment claim.

**6.   *Conclusions***

Based on the foregoing it is therefore

ORDERED as follows:

1.  Defendant's motion for summary judgment (# 64) is DENIED.

-39-

2.  The court will hold a Final Pretrial Conference commencing at 11:00 o'clock a.m. on

**November 18, 2005**, in Courtroom A1001, Alfred A. Arraj United States Courthouse, Denver,

Colorado.  In preparing for and participating in the conference, the parties and counsel will follow

the Instructions for Preparation and Submission of Final Pretrial Order, a copy of which is

attached.


Dated this 8th day of November, 2005.


BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge